Argued September 30, 1953, affirmed as modified February 10, petition for rehearing denied April 14, 1954

GLASER *v.* NORTH'S ET AL. and KAMPFER ET UX.
*266 P. 2d 680*

*W. C. Winslow,* of Salem, and *Edward E. Sox,* of Albany, argued the cause for appellant. On the brief was Edward E. Sox.

*Courtney R. Johns* argued the cause for respondents. On the brief were Goode & Johns, of Albany.

Before LATOURETTE, Chief Justice, and LUSK, BRAND and TOOZE, Justices.

LUSK, J.

This is an appeal by the plaintiff from a decree in a suit to foreclose a chattel mortgage. The facts are

as follows: The defendants, Irwin M. Kampfer and wife (who are the respondents here), were on August 12, 1950, lessees of a storeroom on the ground floor of the Pfeiffer Building in Albany, Oregon, for a term ending March 1, 1966. On August 12, 1950, they entered into a sublease of the premises with John F. North and Layton K. Nosler, who later, with the consent of the lessors, assigned their lease to North's, a corporation. The term of the sublease was from August 15, 1950 to February 25, 1956. The premises were known as The Hub Restaurant and had previously been, and under the terms of the sublease were to continue to be, used for restaurant purposes. On the day of the execution of the sublease and as part of the transaction the Kampfers entered into a contract of conditional sale with their tenants of "all of the personal property described in" an inventory attached to such contract. The consideration was $25,000. The property covered by the contract may be divided into two classes, namely, articles suitable for use in a restaurant and not in any way attached to the realty, and restaurant equipment "designed for the premises", as the defendant Irwin M. Kampfer testified, and installed by him at a cost of $68,000. This equipment was "set in and part of the building was built around it." The conditional sale contract is referred to in the sublease in the following language:

"It is understood and agreed that lessors have by separate agreement of even date herewith, contracted to sell certain equipment now located upon said premises. At the expiration, or any sooner termination of this sub-lease, provided title to said equipment shall then be vested in the lessees under the terms of said contract, it is contemplated that said equipment may be removed from said premises."

Under date of October 19, 1950, the purchase price of the property covered by the conditional sales contract having been fully paid, the Kampfers executed a bill of sale of such property to North and Nosler, and they in turn executed a similar bill of sale to North's, the assignee under the sublease. At about the same time North's borrowed $12,000 from the plaintiff, giving him its note for that amount payable in monthly installments of not less than $500 with interest at the rate of eight per cent per annum, and, to secure payment thereof, executing the chattel mortgage to foreclose which this suit was brought and which covered all the property described in the bill of sale. The note and mortgage are dated October 17, 1950, and the money was apparently borrowed for the purpose of paying off the balance owing on the conditional sales contract.

Sometime in 1951—the exact time is not disclosed—North's defaulted in the payment of rent to the Kampfers under the sublease and abandoned the premises, together with all the personal property and equipment therein. The evidence in this regard is that the rent was paid up to October 1, 1951, and this included amounts recovered by the Kampfers through actions brought by the Kampfers against North's. North's also defaulted in payment of installments due under its note to the plaintiff. On December 21, 1951, the plaintiff commenced this suit to foreclose his mortgage. On the day following the Kampfers took possession of the premises and padlocked the door. North's defaulted, and on this appeal we are concerned with a controversy between the Kampfers, the landlords, on the one hand, and Glaser, the mortgagee, on the other, respecting the ownership of a portion of the property included in the chattel mortgage. By its

decree the court divided the mortgaged property into the two classes. above indicated. As to the articles not attached to the realty the court entered a decree of foreclosure of the plaintiff's mortgage. The remaining equipment, termed fixtures in the decree, was adjudged to be the property of the defendants Kampfer, free from any claim of the plaintiff. The uncontradicted evidence is that all the equipment included in this category was affixed to the realty and that if it should be removed the cost of repairs and restoration necessitated by such removal would be in excess of $4,000.

■ On this appeal the principal contention of the plaintiff is that the court erred in excluding from the decree of foreclosure the property described as fixtures. It is urged in support of this claim that the parties to the sublease had treated the equipment attached to the realty as personal property, and that it was therefore subject to the lien of the chattel mortgage executed by North's to Glaser. There can be no doubt that for the purposes of this case the fixtures must be regarded as personal property as long as North's continued in possession of the leased premises under the sublease, and therefore that the lien of plaintiff's chattel mortgage attached to that property as well as to the remaining articles described in the instrument. These improvements were trade fixtures sold and transferred to the sublessees by the Kampfers through instruments separate from the lease, and which clearly indicated the intention of the parties to treat the fixtures as personalty. The sublease itself moreover recognized their character as personalty by granting the right to the sublessees to remove them at the expiration of the lease or its sooner termination.

■ "The giving of a bill of sale to an article attached

to the soil at the same time a deed is executed covering the realty is an indication that the parties intended the articles should be deemed personal property." *Mattechek v. Pugh,* 153 Or 1, 6, 55 P2d 730. The opinion in the case cites numerous decisions of this court in support of the holding that parties may agree that the annexation of a chattel to the land shall not deprive it of its character as personalty, and that the interested parties may agree that an article already annexed to the soil shall be deemed personalty.

■ These rules, however, well settled though they may be and entirely applicable here, are by no means dispositive of the case for the questions that must be determined are whether North's lost its rights to the fixtures by abandoning them, and, if so, whether the mortgagee's right fell with North's. Upon these questions the law of this state is equally well settled. In *Blake-McFall Co. v. Wilson,* 98 Or 626, 193 P 902, 14 ALR 1275, this court, speaking through Mr. Justice HARRIS, said:

> "* * * The general rule is that a term tenant cannot remove fixtures after the expiration of his term; and the prevailing doctrine is, too, that the landlord becomes the absolute owner of fixtures if the tenant surrenders the premises without removing the fixtures. The right to remove a fixture may, like many other rights, be abandoned or waived; and, consequently, when the tenant's term ends and his right to possession terminates and he leaves fixtures on the premises, he is deemed to have waived his right and abandoned the fixtures: 11 R.C.L. 1071."

See, also, *General Petroleum Corp. v. Shefter,* 141 Or 349, 352, 16 P2d 645; 22 Am Jur 756, Fixtures § 43; Annotations 6 ALR2d 322, 39 ALR 1099. It is also

held that where the tenancy has been wrongfully terminated by the landlord the tenant has a reasonable time in which to re-enter and remove fixtures. *Eldridge v. Hoefer*, 45 Or 239, 77 P 874. That question, however, is not involved in this case. Here the right of removal was fixed by the terms of the sublease as "at the expiration, or any sooner termination of this sub-lease", and the evidence is clear and uncontradicted that North's defaulted in the payment of rent, abandoned the premises and the fixtures and made no effort to recover them, and that the Kampfers thereupon took possession and terminated the lease. As a result the lessee's title to the fixtures failed and it lost its right of removal. The mortgagee has no better title than the lessee, and, if the tenant would have no right of removal owing to the expiration of the tenancy or his relinquishment of possession, one to whom he has mortgaged the articles would have no such right. *Couch v. Scandinavian-American Bank*, 103 Or 48, 58, 59, 197 P 284, 202 P 558, 203 P 890, and numerous authorities there cited. See, also, *Smith v. Reigleman*, 143 Or 463, 467, 23 P2d 129; *Donahue v. Hardman Estate*, 91 Wash 125, 157 P 478; *Shelton v. Jones*, 66 Okla 83, 167 P 458; 14 CJS 642, Chattel Mortgages § 33; 22 Am Jur 757; Fixtures § 43.

For the purposes of illustration we will refer to *Bush v. Havird*, 12 Ida 352, 86 P 529, one of the decisions cited with approval in *Couch v. Scandinavian-American Bank*, supra. The lessees of a saloon building installed in the premises and attached to the realty bar fixtures, an ice chest, etc., and executed a chattel mortgage on this property which was assigned to the defendants. The lessees defaulted in the payment of rent, and the owners of the premises secured possession through legal proceedings. The tenant did not

seek to remove the fixtures, but the owners of the mortgage, after the landlord took possession of the building, commenced a proceeding before the sheriff to foreclosure the mortgage, and, when the owner of the premises refused to deliver up possession, caused the sheriff to break open and forcibly enter the building and remove the mortgaged property. The owner thereupon sued the assignees of the mortgage to recover judgment for the value of the property so removed. The court, in an opinion by Ailshie, J., reversed a judgment for the defendant. The mortgaged property was held to be "trade fixtures" and therefore removable by the tenant, both under a statute of Idaho and at common law. But this right, it was said, must be exercised by the tenant prior to surrendering possession or to eviction for a breach of the lease. Otherwise the right is lost. The court continued:

"The only further question left for our determination is, did the mortgagee or his assignees acquire any greater or superior rights to those of the tenant or mortgagors? We think there can be but one answer to that question. When the mortgagee took a mortgage on this property, he took it subject to all the restrictions placed by law upon the tenant, who was the mortgagor, and he could acquire no rights greater than or superior to those of his mortgagor [citing authorities]. When the tenant abandoned his right of removing this property and lost the possession and right to re-enter, that disability extended to his mortgagee with equal force and effect. The law will neither impose upon the landlord a duty nor necessity of either housing or taking care of the fixtures which his tenant leaves behind after his term has expired. Neither will the law permit the tenant nor any one claiming under him to re-enter the premises for the reason that to do so would encourage breaches of the peace, and would in many cases hazard and

impair the landlord's right of leasing the premises to another tenant, and lessen the full and free enjoyment of those premises by such tenant."

The Couch case involved the right to remove a building on leased land which had been erected by the lessee under an agreement that it might be removed within 90 days after expiration of the term. The tenant executed to the defendant bank a chattel mortgage on the building. The tenant defaulted, and the landlord canceled the lease, and thereafter sued to cancel the apparent lien of the bank's chattel mortgage. Applying the rules above stated, this court held that the right of the tenant in the building had been lost by reason of its failure to remove it within the time stipulated in the lease, and that the bank's right in the property, which was no higher or greater than that of the tenant, would likewise have been lost but for circumstances which would have made a forfeiture of its lien inequitable. The court said: "The Scandinavian-American Bank should have protected itself against the forfeiture of its security. It had a right to pay the rent and taxes so as to prevent the forfeiture of the lease." But it was said that the bank had been lulled into a sense of security by representations made to it by the agent of the owners of the land. It appeared, moreover, that the owner had recovered a judgment against a surety company, $6,500 of which was for damages resulting from the lessee's failure to remove the building. For these reasons, it was held, the plaintiff "was not in a position to seek equity." A decree was entered permitting foreclosure of the bank's mortgage upon the payment by it to the owner of the land of taxes, rents, assessments, etc., to which she was entitled under the lease.

As there is in this case no evidence of inequitable conduct on the part of the defendants Kampfer which would justify the court in refusing to apply the well-established rules of law applicable to cases of this kind and approved in *Couch v. Scandinavian-American Bank,* supra, it follows that the circuit court was right in holding that the defendants were the owners of the fixtures free from any claim of the mortgagee.

██ The evidence supports the judgment of $500 granted to the defefndants Kampfer for storage to the date of the decree of the articles, not fixtures, found to be subject to foreclosure. These articles could have been removed from the building by the plaintiff but he chose to leave them there. In these circumstances the law would imply an agreement on his part to pay for such services. *Roberts v. Gerlinger,* 124 Or 461, 467, 263 P 916; 12 Am Jur 501, Contracts § 5. The court was without authority, however, to provide for a judgment for storage which might or might not be furnished in the future, and the decree must therefore be modified by the elimination of that provision. Otherwise it is affirmed.

Submitted on motion to dismiss appeal January 23, 1953, denied.
February 18, 1953; Argued March 24, 1954, reversed and
remanded with directions April 14, 1954

## HICKLIN *v.* ANDERS

253 P. 2d 897
269 P. 2d 521

*Meindl & Mize, Ray Mize* and *R. E. Kriesien,* of Portland, for the motion.

*Ray G. Brown,* of Portland, contra.

LUSK, J.

The case is before the court on motion of respondent, William H. Anders, to dismiss the appeal.

The action was for personal injuries. The appellant, Everett Hicklin, on April 2, 1952, recovered judgment for $15,000.00 against the respondents, Anders and Elbert G. Mulkey, administrator of the Estate of James Joseph Bannister, deceased, hereinafter called the ad-

ministrator. (Cleo Bannister was later appointed administratrix in the place of Mulkey.) On motion the court set aside the verdict against Anders and entered judgment in his favor notwithstanding the verdict. From that judgment Hicklin appealed, and the administrator likewise appealed from the judgment against him. Hicklin commenced garnishment proceedings against Anders, the administrator, and Pacific Indemnity Company, the administrator's insurance carrier, and recovered a judgment against the garnishee for $5,084.77. Pacific Indemnity Company took an appeal from that judgment. While these various appeals were pending Hicklin and his attorney, under date of January 12, 1953, executed an instrument designated "Covenant" by which they covenanted and agreed, in consideration of $4,750.00, not to proceed further against Pacific Indemnity Company or the administrator on account of Hicklin's injuries

"or on account of said judgment for damages or on account of said judgment in said garnishment proceeding, and that said Everett Hicklin will not issue or cause to be issued or served further execution against either said Pacific Indemnity Company or said estate of James Joseph Bannister, deceased, or anyone on their behalf on account of said matters, and will not otherwise sue said Pacific Indemnity Company or said Cleo Bannister as said administratrix or individually, or said Elbert G. Mulkey as such administrator, for or on account of said injuries or anything arising out of the same or on account of said judgments or either of them."

The instrument further provided:

"It is specifically understood and agreed, however, that this covenant, in no way restrains, restricts or prohibits said Everett Hicklin or anyone on his behalf from continuing said appeal as against said William H. Anders and proceeding with said

action against said William H. Anders, it being expressly understood that it is the intention of said Everett Hicklin to continue with said appeal against said William H. Anders to a final conclusion and to continue with said action against said William H. Anders, both in said Supreme Court and said Circuit Court, and if possible to recover the balance of said judgment as against said William H. Anders and this covenant is not to be construed or treated as a release or accord and satisfaction of any claim or demand which said Everett Hicklin has or claims to have against said William H. Anders."

Contemporaneously, the garnishment proceedings and the administrator's appeal to this court were dismissed on stipulation of the parties, and Hicklin, by his attorney, executed a satisfaction of the judgment against Pacific Indemnity Company, garnishee, in the sum of $5,084.77. The instrument of satisfaction further provides that Hicklin

"does not satisfy the judgment made and entered herein on or about the 3rd day of April, 1952 in favor of plaintiff and against the above named William H. Anders and Elbert G. Mulkey as such administrator in the amount of $15,000.00 together with certain costs and disbursements, but said Everett Hicklin by his said attorney, does hereby acknowledge receipt upon said $15,000.00 judgment so made and entered on or about April 3, 1952, of the sum of $4,750.00 in partial satisfaction only of said judgment for $15,000.00 together with costs and disbursements."

To support his motion Anders relies on the rule that the release of one or two or more joint tortfeasors releases all. *Stires v. Sherwood,* 75 Or 108, 145 P. 645. He concedes that in this state, as in most other jurisdictions, this rule has no application to a covenant not to sue. *McKay v. Pacific Bldg. Materials Co.,* 156

Or 578, 68 P2d 127; *Murray v. Helfrich,* 146 Or 602, 30 P2d 1053; *Keadle v. Padden,* 143 Or 350, 362, 366, 20 P2d 403, 22 P2d 892. But he argues that in this case the suit is an accomplished fact and therefore an agreement not to sue is meaningless; and that the "Covenant" is in fact an accord and satisfaction which operates as a discharge of the judgment and of both joint tort-feasors, citing 1 Am Jur 257, Accord and Satisfaction §§ 8, 73; *Clay v. Hoysradt,* 8 Kan 74; *Cooper v. Sagert,* 111 Or 27, 223 P 943; Restatement, Torts § 886.

It is sufficient to say of the decisions cited that they are not in point. As to the claim that what the parties did amounted to an accord and satisfaction, precisely the same argument was made in *McKay v. Pacific Bldg. Materials Co.,* supra, with respect to the covenant not to sue involved in that case, and was rejected. The only difference between the two cases is that in the one the agreement was made before judgment and in the other after judgment. In the McKay case payment was made in settlement in order to get rid of an unliquidated claim, and in this case in order to get rid of the consequences of a judgment from which an appeal had been taken and was pending. In both the intention is made clearly to appear that the money was not accepted in satisfaction of the entire claim and that the settlement made with one defendant should not affect the injured party's rights against the other. According to 45 Am Jur 702, Release § 37, "There appears to have been an increasing tendency in the later cases to give effect to the actual intention of the parties so far as possible." The numerous cases digested in 124 ALR 1306 and 104 ALR 852 support that statement. See, also, 66 ALR 209 and 50 ALR 1072. Many of the earlier cases are cited in *Stires v. Sherwood,* supra at p. 113. No reason has been suggested, nor does any occur to us, which

warrants the assertion that there is an irreconcilable conflict between the acts of Hicklin and his expressed intention to preserve his rights against Anders.

Our research has discovered but two cases involving similar facts. These are *Pertroyeanis v. Pirola,* 205 Ill App 310, and *Pennington v. Bevering,* (Tex) 17 SW2d 772. In the former case the court held that acceptance by the plaintiff of payment of a part of a judgment from one of the joint tort-feasors operated to discharge the other, notwithstanding the expressed intention of the parties that this should not be its effect. There is no opinion in the case, but simply an "Abstract of the Decision", which states the court's conclusions. The opposite result was reached by the Texas court in *Pennington v. Bevering,* which held that the instrument of release evidenced the intention of the parties that the creditor reserved the right to proceed for the balance against the nonsettling judgment debtor and that this intention should be given effect. In our opinion the Texas court's decision is sound and accords with modern judicial thinking relative to settlements of this kind. At least it can be said for this view of the matter that it "offers a way for a party to buy his peace and allows an opportunity to compromise a doubtful claim without requiring an injured party to forego the right of full compensation against known wrongdoers." *Cook v. City Transport Corp.,* 272 Mich 91, 261 NW 257.

In *Black v. Martin,* 88 Mont 256, 292 P 577, the court reviewed extensively the judicial decisions and the observations of eminent text writers, showing the disfavor into which has fallen the rule that a release to one of several joint tort-feasors is a discharge to all, and the efforts of the courts to avoid application of that rule whenever possible. Dean Wigmore, according

to the Montana court, called the rule a "surviving relic of the Cokian period of metaphysics." The case before the court did not involve an agreement not to sue but a release to one, with a reservation of rights against another joint tort-feasor. Holding that effect should be given to the intention of the parties, the court said:

"As each tort-feasor is liable for the entire damage, if one sees fit to secure acquittance for himself by compromise with the injured person, he does no wrong to those who are jointly liable with him. How can they complain if he has paid part of the damage? They are not prejudiced by the settlement, but on the contrary are benefited, for each is entitled to have the amount of any judgment rendered against him reduced by the amount paid by his cotort-feasor. ⁂ ⁂ ⁂

"The law favors compromises. This is especially true in tort actions, not only because they relieve the labors of courts, and avoid expense, but also because, where the parties agree between themselves upon a settlement of the claim, the result reached is frequently a more equitable adjustment than is possible to be had in a court of law. (10 Virginia Law Review, 72.)"

Dissatisfaction with the "finespun" and "overtechnical" law of joint tort-feasors (*Cook v. City Transport Co.,* supra) has led to the enactment of statutes, some of which substantially abolish the rule that a release to one of several joint tort-feasors discharges all, while others provide that releases must be given effect according to the intention of the parties. 45 Am Jur 702, Release § 37. No statute is needed, however, to enable a court to adopt the latter rule, and we, therefore, hold that, since Hicklin's intention in executing the covenant and in partially releasing the judgment was not to release Anders, Hicklin's right to proceed with the appeal against Anders has not been affected,

### On the Merits

Before LATOURETTE, Chief Justice, and ROSSMAN, TOOZE and PERRY, Justices.