R. C. PEPIN, individually, and R. C. Pepin, a general partner in the partnership consisting of R. C. Pepin, Guy N. McCauley and Velma V. McCauley, Plaintiffs,

v.

CITY OF NORTH BEND, a municipal corporation, I. N. Hartley, Frank Leonard Sandine, E. Kenton Thompson, C. Philip Sundbaum, E. J. Costley, Roger T. Duncan, Charles Bentley, Robert L. Thomas, and Robert F. Herrington, Defendants.

Civ. No. 9593.

United States District Court
D. Oregon.

Aug. 18, 1961.

William H. Morrison and Jack H. Dunn, Maguire, Shields, Morrison, Bailey & Kester, Portland, Or., for plaintiffs.

William E. Walsh, Coos Bay, Or., for defendant Hartley.

Manley Strayer, Hart, Rockwood, Davies, Biggs & Strayer, Portland, Or., and Robert L. Thomas, North Bend, Or., for defendant City of North Bend.

EAST, District Judge.

## Parties

The plaintiff R. C. Pepin proceeds herein individually and as the succeeding partner of the copartnership lately consisting of R. C. Pepin, Guy N. McCauley and Velma V. McCauley (Pepin), and is a resident and citizen of the province of British Columbia, Canada. On May 20, 1957, said Guy N. McCauley and Velma V. McCauley were each adjudged to be bankrupts, thereby said copartnership was dissolved, and Pepin succeeded to its assets.

At all pertinent times the defendant City of North Bend (City) was a municipal corporation and body politic of the State of Oregon, and defendant I. N. Hartley, and defendants Frank Leonard Sandine, E. Kenton Thompson, C. Philip Sundbaum, E. J. Costley, Robert T. Duncan and Charles Bentley were the duly elected and acting Mayor and members of the City Council of the City, respectively (Officials).

## Jurisdiction

This Court has jurisdiction of the cause by reason of diversity of citizenship of the parties and the fact that the amount in controversy exceeds the amount of $10,000. Title 28 U.S.C.A. § 1332.

## Statement of the Case

On February 22, 1947, the United States of America (Government) was the owner of the North Bend Naval Auxiliary Air Station (Station), situated northwesterly of the City, and the buildings located thereon. On or about that date, City made application to Government to acquire the Station, with certain structures and facilities located thereon, which had previously been classified as available for disposal under the Surplus Property Act of 1944, 50 U.S.C.A. Appendix, § 1611 et seq. At the conclusion of the negotiations between City and Government, acting through the War Assets Administration, an executed agreement of sale, dated September 15, 1947, was delivered to City, covering land of the Station and certain equipment and structures located thereon. Among the structures included in the sale were buildings designated as numbers 46, 47, 48 and 49.

On November 1, 1947, Ernest L. Frye and Edward Sandine, Mayor and Recorder, respectively, of City, executed in the name of City an executory contract for the sale and purchase of buildings Nos. 46, 47 and 48 to R. C. Pepin, A. R. Pepin and Lillie Pepin, copartners aforesaid, doing business as "New Hotel North Bend." On November 12, 1947, the same persons executed in the name of City a like executory contract for the sale and purchase of building No. 49 to the same purchasers. As part of the same transaction, separate instruments were executed under which City leased to the copartnership the land on which the mentioned buildings were situated. The buildings were originally constructed for use as bachelors officers' quarters on the Station. When the executory agreements for the sale and purchase of the mentioned buildings were entered into it was the contemplation and intention of all parties that the purchasing copartnership would remodel, convert and operate the mentioned buildings in conjunction with the underlying land as hotel and apartment-house premises. Pepin and City, through its Officials, are agreed that immediately prior to the execution of the mentioned executory contract of sale and leases to the copartnership in

November, 1947, the mentioned buildings were permanent fixtures upon the land and as such were real property. Pepin contends: "That the buildings became personal property upon and by virtue of the sales contract and ground leases to the copartnership and the attending circumstances." And that on or about May 18, 1957, City, acting through its Officials, without the consent of Pepin, wrongfully took possession of the personal property and converted the same to their use and possession, to Pepin's damage. City, through its Officials, contends that the buildings referred to in the executory contract of sale, remained and continued to be real property, and denies any conversion upon its and their part and any resulting damage to Pepin.

### Segregated Issues

The parties to the cause, through a supplemental pretrial order herein, have agreed that the following issues should be segregated and a separate trial thereon shall be had in advance of trial of any remaining issues, viz.:

1) Whether the buildings alleged to have been converted by defendants were real property or personal property.

2) Whether the contracts under which plaintiffs claim title to and right to possession of said buildings were void.

The parties have entered into extensive agreed facts and have offered into evidence upon these segregated issues various documentary evidences.

### Discussion

■■ There is a presumption that a building or similar structure is technically a fixture and, therefore, real property. In Waldorf v. Elliott, 1958, 214 Or. 437, 330 P.2d 355, 357, the plaintiff brought an action for conversion of metal grain tanks. Plaintiff and defendant had contracted for the exchange of certain real properties, making no mention of the tanks located on defendant's land. After the making of the contract, defendant sold the tanks and the purchaser removed

them from the land. Judgment for the plaintiff was affirmed; the grain tanks were held to be fixtures and a part of the real property passing to plaintiff under the contract. The Oregon Supreme Court quoted with approval the following statement from 22 Am.Jur. 778, Fixtures § 63:

"As a general rule, a building on land is considered as part of the realty, or at least, it is so presumed; and the burden of proof is upon the party who claims that it is personal property to show that it retains that character."

It follows that, where buildings are admitted to have become part of the realty, the burden of overcoming the presumption and proving that there subsequently has been a constructive severance so as to change their status to personalty is upon the party making such contention. Therefore, Pepin carries the burden in this respect.

A search of the Oregon law reveals no case precisely in point with the one at bar. However, I shall review, in chronological order, some of the leading Oregon cases dealing with this general subject. In Van Orsdol v. Hutchcroft, 1917, 83 Or. 567, 163 P. 978, 979, the court stated that "in order to overcome the presumption that a building is real property, a pleading must allege facts showing the structure was placed on a temporary foundation and erected with the intention that it should be removed, or that it had been taken from its original support so as to be moved away." However, this can no longer be regarded as the exclusive test, as will appear from the discussion of more recent cases.

In Enterprise Mercantile & Milling Co. v. Cunningham, 1917, 84 Or. 319, 165 P. 224, 225, appears the following:

"It is fundamental that a constructive severance of a fixture must arise from the intention of the owner as evidenced by his acts, and there is not a vestige of evidence in the record of any intention upon the part of [the house owner] to sever

the house from the land and, in fact, it was never severed. Nor, indeed, could the disclosed purpose of a future severance act to change the character of the building from real estate to personal property."

Accordingly, it was held in that case that *negotiations* for the sale of a house would not constitute a constructive severance.

In Burdick v. Tum-A-Lum Lumber Co., 1919, 91 Or. 417, 179 P. 245, the court held that a complaint in replevin, seeking possession of a warehouse, is defective unless it alleges facts which would take it out of the classification as real property where, *prima facie*, it belongs. However, the court went on to decide that the conditional vendee of the warehouse properly could bring an action in replevin to regain possession thereof, where the owner of the land and all other parties interested had treated the warehouse at all times as personal property.

Blake-McFall Co. v. Wilson, 1920, 98 Or. 626, 193 P. 902, 905, 14 A.L.R. 1275, was an action for conversion of a freight elevator which had been installed in a building previously erected by the plaintiff. After installation of the elevator, the building was sold by the plaintiff to the defendant. Subsequently, the premises were conveyed to a third party, who had no notice that the plaintiff had reserved the right to remove the elevator. In its opinion, the court set forth three tests to be used for determining whether personalty has been transformed into realty: (1) annexation, (2) adaptation, and (3) intention. The court concluded that, at the time of the elevator's installation, it became a part of the realty. Although the officers of the plaintiff corporation then had the intention to remove the elevator *if* the building were sold and the corporation moved its place of business, there was no showing of a definite intention to move. The opinion contains this statement:

"At the most, the intention, whenever formed by the corporation through its officers, was contingent, unexecuted, and inchoate, and hence it cannot control the result."

However, it was held that the agreement to sell the building, with its express exception of the elevator, operated as a constructive severance of the elevator. The elevator was thereby reimpressed with the character of personal property, as between persons having notice of the agreement.

A leading case on constructive severance by agreement is Mattechek v. Pugh, 1936, 153 Or. 1, 55 P.2d 730, 732. That was an action for conversion of 16 refrigerators, certain electric light fixtures, a heating plant, and other articles comprising the furnishings of an apartment building. Defendants constructed the apartment building, but before its construction was entirely complete, executed a deed to the plaintiff's predecessors covering the apartment house and underlying real property. On the same day, defendants executed a bill of sale transferring to the same persons some of the same property which became the subject matter of the conversion action. These items were referred to in the bill of sale as "personal property." The court held that the items, although formerly part of the realty, were changed to personalty by agreement of the parties, i. e., the bill of sale. The following exposition of the law appears in the opinion:

"Whether an article attached to the realty is real property or personal property is dependent, not only upon its character and the manner of its attachment, but also to some extent upon agreements, if any, relating to its status. The giving of a bill of sale to an article attached to the soil at the same time a deed is executed covering the realty is an indication that the parties intended the articles should be deemed personal property. The bill of sale in such an instance effects a constructive severance of the article from the soil and restores to it its original status as personalty. * * * This court has recognized that parties may agree that the annexation of a chattel to the land shall not deprive it

of its character as personalty. [Citations omitted.] Likewise, this court has held that the interested parties may agree that an article already annexed to the soil shall be deemed personalty. Blake-McFall Co. v. Wilson, 98 Or. 626, 193 P. 902, 14 A.L.R. 1275; Kennedy v. City of Hood River et al., 122 Or. 531, 259 P. 911; First State & Savings Bank v. Oliver, 101 Or. 42, 198 P. 920; Lees v. Hobson, 90 Or. 248, 176 P. 196. Such agreements are effective between the parties and those having notice."

The case of Cross v. Campbell, 1944, 173 Or. 477, 146 P.2d 83, 91, is somewhat instructive concerning the subject of intention of the parties as a factor in determining the status of property attached to the land. That case was an action by a lessee of land, against a subsequent lessee, for conversion of sawmill machinery and equipment. The court affirmed a judgment for the plaintiff, holding that the items never lost their status as personal property. The grounds for the decision were: (1) the plaintiff's lease expressly provided that he would remove his property promptly upon expiration of the lease, and (2) the plaintiff's lessor expressly disclaimed ownership of any of the equipment. The court noted that:

"In Wheeler v. McFerron, 33 Or. 22, 52 P. 993, we recognized that a structure as important as a warehouse 'may be personal property, for which an action of replevin * * * will lie.' See to like effect 22 Am. Jur., Fixtures, §§ 64 and 65. The reason for the decision just cited was the fact that the parties had not intended the building to become part of the land. Today, the intention of the parties is of pre-eminent importance. Blake-McFall Co. v. Wilson, 98 Or. 626, 193 P. 902, 14 A.L.R. 1275."

In Glaser v. North's, 1954, 201 Or. 118, 266 P.2d 680, 681, the lessees of a restaurant subleased it, and on the same day entered into a conditional sales contract for the sale of "all of the personal property described in" an inventory attached to the contract. A portion of the property covered by the contract consisted of equipment incorporated into the building itself and thereby attached to the realty. The sublease conferred upon the sublessee a right to remove the equipment at the time of termination of the sublease, provided that title to the equipment had passed to the sublessee. The purchase price of the property was paid, and the sublessee received a bill of sale of the property. The sublessee then borrowed money from the plaintiff, giving a note secured by a mortgage which covered all the property described in the bill of sale. Some time thereafter, the plaintiff brought suit to foreclose upon his mortgage. The court stated that:

"There can be no doubt that for the purposes of this case the fixtures must be regarded as personal property as long as [the sublessee] continued in possession of the leased premises under the sublease, and therefore that the lien of plaintiff's chattel mortgage attached to that property as well as to the remaining articles described in the instrument. These improvements were trade fixtures sold and transferred to the sublessees by the [sublessors] through instruments separate from the lease, and which clearly indicated the intention of the parties to treat the fixtures as personalty. The sublease itself moreover recognized their character as personalty by granting the right to the sublessees to remove them at the expiration of the lease or its sooner termination."

(However, it was held that the sublessee waived the right to remove the physically-attached equipment by abandoning the premises without removing them. Consequently, his mortgagee could not prevail, as to those items, against the sublessor.)

As is pointed out in City's reply brief, the basic difference between the parties on this issue concerns that which must be *intended* in order to convert to personal property buildings which are affixed to

the land. The buildings were never physically removed from the land, and there has been no showing that anyone ever formed an intention actually to remove them from the land. It is beyond question that there are circumstances under which a constructive severance of articles attached to the soil can be brought about by agreement between the owner and another person. Pepin contends that the contractual reference to the buildings as "personal property," together with sound business reasons for so designating them and objective evidence of intention so to regard them, is sufficient to bring about a constructive severance. City contends that, in addition to the contractual designation, there must be at least a manifestation of intention physically to sever the buildings from the land. City also persuasively argues that the reference to the buildings as personal property was inadvertent and mistaken. However, the fact remains that the contract contains an objective manifestation of intention to sell personal property.

■ I think it fair to conclude, under the authorities heretofore discussed, that the requisite intention with which we are concerned is an intention by the parties that the property be treated as personalty, and that the legal incidents of such status should attach thereto. I find no support for the proposition that the requisite intention for a constructive severance is a fixed intention to remove the annexed article from the land. An intent to remove would strongly evidence a desire that the attributes of personalty should attach to the article, but a definite intention to sever the article from the land is not a *sine qua non* of constructive severance. "Constructive" severance implies a situation in which an item of property is deemed by the law to have been severed from the land, even though it has not been severed as a matter of physical fact. But all that this so-called "severance" signifies is that the thing in question is thereafter to be regarded in law as personal property. This same result manifestly may be accomplished by agreement of the parties interested.

If such an agreement is made concerning a building, the building does not thereby become personalty for all purposes as to all persons, but as between the persons making the agreement and their respective privies and all others having notice thereof, the building assumes the character of personal property.

This conclusion concerning the applicable legal principles renders it desirable to examine the evidence in the case, for the purpose of ascertaining the terms of the parties' agreement and their intentions underlying the agreement, to the extent that the latter may be objectively determined.

■ The executory contracts of sale and purchase of the buildings each contained the provision that

"Second parties agree to purchase from first party the following described *personal property*," etc. [Emphasis supplied.]

Of course, there cannot be absolute certitude as to the reason for the use of the term "personal" property, but such language does indicate the parties' belief with reference to the status of the buildings, and their intention in that regard, and cannot now be construed as inadvertent language.

The contracts also contain this language:

"The buildings hereinbefore described shall not be removed from said lands and premises prior to the time of final payment * * * "

Pepin contends that this language constitutes a grant of the right to remove the buildings after final payment. City contends that the purpose of the clause was not to grant a right of removal, but rather it was merely to prohibit any right of severance which Pepin might claim before final payment.

The contracts of sale constituted an agreement for the sale of buildings only, and it is clear that so long as the executory contracts were in full force and effect, Pepin was the beneficial owner of the buildings, and the prohibition of removal until final payment was a form of

retention of legal title by City as security for the full payment of the purchase price.

Under the executory contracts of sale, the purchasers obtained the right upon final payment to receive the legal, unconditional title to the buildings and to become the absolute owners thereof. In the absence of any default in payment of the purchase price, the purchaser under such a contract is the equitable or beneficial owner of the property agreed to be transferred. Richardson v. Bouthillier, 1951, 193 Or. 354, 238 P.2d 212; Keller v. Lonsdale, 1959, 216 Or. 339, 339 P.2d 112.

The right to use the underlying land was conferred by separate ground leases. At the time the executory contracts were executed, City had obtained complete ownership of the buildings from Government. But, as to the underlying land, City's ownership was subject to a right in the Government to repossess and use the land during the existence of any national emergency. Although the evidence indicates that the purchasers were interested in continued occupancy of the land, rather than removal of the buildings, still the reasonable assumption is that such large-scale renovation was not intended merely to constitute improvement of City's real property.

The record discloses that there were sound business reasons for treating the buildings as personalty, and that the contracts expressly were for the sale of personal property. Therefore, the Court concludes that as between the parties to the executory agreements of sale and purchase, their privies, respectively, and all persons having reasonable notice, and as long as the same was in full force and effect, the mentioned buildings 46, 47, 48 and 49 were, by operation of law, severed from the real property upon which they were located and were personal property.

Going now to the second segregated issue for adjudication by the Court as to the validity of the executory contract for the sale and purchase of buildings 46, 47, 48 and 49, and the lease of the underlying land, it is noted that City contends that the contracts, under which Pepin claims title to and right to possession of the buildings, were and are void. Pepin contends that the contracts were executed on behalf of City by duly elected or appointed officers or agents of City, and that the execution of the contracts was authorized by appropriate formal action on the part of the City Council.

The minutes of the regular meeting of the City Council held July 22, 1947, reflect the following:

"A motion was made, seconded and carried that the City sell to Art Pepin the Senior Officer's quarters building at the airport for $15,-000.00, along with lease for 15 years necessary property needed for $1.00 year, with first opportunity to purchase property on which the building is situated, contract to bear 4% interest."

The minutes of adjourned meeting of the City Council held August 26, 1947, contain this statement:

"A motion was made, seconded and carried that A. R. Pepin be sold buildings # 46, 47 and 48, at the airport for $5,000.00, ⅓ down payment, $1,000.00 per year for the balance at 4% interest providing that they are converted into apartments and bachelor apartments quarters within a period of 6 months."

Subsequently, the executory contracts of sale and purchase of said buildings were executed as aforesaid.

Discussion

■ (1) Section 6 of the then-existing city charter provided as follows:

"Section 6. The City of North Bend is not bound by any contract or in any way liable thereon, unless the same is authorized by a city ordinance, or resolution, duly passed by the council, and made in writing, and signed by the recorder, or by some board, body, person or persons so empowered, in behalf of the city * * *"

In Winklebleck v. City of Portland, 1934, 147 Or. 226, 31 P.2d 637, 641, it was said that:

"* * * provisions in charters which place limitations upon the powers granted to municipal officers, which are intended to safeguard the interests of those who dwell within the municipality, are mandatory in character; that a grant of power, the exercise of which is restricted to a specific mode, excludes the exercise of that power in any other manner; that those who deal with the municipality are charged with knowledge of these limitations; that these limitations are equally applicable whether the municipality is exercising a proprietary or governmental power; that all claims against the municipality founded upon any conduct which is prohibited by such charter provisions are invalid, whether the basis of the claim is contract, implied liability, estoppel, or ratification."

As pointed out by the court in that case, the policy underlying requirements such as are contained in Section 6 is the safeguarding of the interests of the city against improvident contracts. See also, Forrester v. City of Hillsboro, 1937, 156 Or. 89, 66 P.2d 496, and White v. City of Seaside, 1923, 107 Or. 330, 213 P. 892, 894. In the latter case, it was held that a charter provision similar to the one under discussion is mandatory, and that "where a municipal charter points out a particular method in which a contract is to be executed, the method so prescribed is the measure of the power."

█ Under the foregoing authorities, the failure to authorize the contracts by ordinance or resolution would render them invalid unless the action taken by motion was the equivalent of a resolution. I think that it was.

"It is true that this action of the council appears in its record in the form of an informal motion made and carried, rather than in the form of a resolution. It seems, however, that in substance there is no difference between a resolution and a motion. Indeed, the terms are practically synonymous." City of Spokane v. Ridpath, 1913, 74 Wash. 4, 132 P. 638, 640. See also, School District of Birmingham v. School District No. 2 of Bloomfield, 1947, 318 Mich. 363, 28 N.W.2d 265; and, 37A Words and Phrases page 6.

The action of the City Council in authorizing the contracts by motion meets the spirit of the requirement in Section 6 of the charter that the contracts be authorized by resolution. The charter prescribes no particular form of resolution. There is no requirement that the resolution be reduced to writing before it will be deemed to have been "duly passed by the council." The only thing required by Section 6 to be made in writing is the contract. A resolution is merely the expression of the legislative will, which was well expressed by the motions recorded in the minutes of the council meetings.

█ (2) Section 61, paragraph 4, of the charter provided as follows:

"Section 61. The Council has power and authority, subject to the provisions, limitations, and restrictions in this charter contained:

* * * * *

"4. To provide for entering into contracts by the City for a period not exceeding five years, except as in this Charter otherwise provided; * * *"

The executory contracts of sale required final payment within the five-year period. It is clear, as City admits, that the contracts of sale would not violate the five-year limitation if viewed as transactions separate and distinct from the leases. However, from the facts that the leases were to extend for a longer period and that the only valid consideration for the leases is to be found in the contractual obligations assumed by the purchasers, City contends that the leases and contracts must fall together. This contention is without merit. Assuming *argu-*

**652**

*endo* that the ground leases were invalid, this would not affect Pepin's rights in the buildings upon the payment of the purchase price.

[8] (3) Section 61, paragraph 9, of the charter provided as follows:

"Section 61. The Council has power and authority * * * * * * * *

"9. To provide for the sale at public auction, after advertising for not less than five days, of all personal property unfit or unnecessary for the use of the city; * * * "

None of the buildings were advertised for sale, nor sold at public auction. City contends that, if the buildings became personal property by constructive severance, paragraph 9 is applicable and the contracts of sale are void because of noncompliance therewith. Pepin argues that paragraph 9 is inapplicable because the buildings did not become personal property until immediately after execution of the sale contracts. The Court is constrained to agree with the latter. Prior to the sale contracts, during all times that the buildings were beneficially owned by City, the buildings were real property. The charter provision relating to the manner of disposing of personal property is not applicable. It was the legal effect of the contracts which changed the status of the buildings from realty to personalty; paragraph 9 cannot be used as applied retroactively to invalidate otherwise valid contracts.

### Conclusion

The Court concludes that, under the charter, the City Council had the power to authorize these contracts; the Council authorized the contracts by substantially complying with all its charter provisions; the contracts were validly executed pursuant to the Council's intentions and authorization and are valid and binding upon City.

In view of the foregoing conclusion, it becomes unnecessary to deal with Pepin's contentions of estoppel and ratification on the part of City.

The foregoing opinion is presently advisory to the parties and counsel and shall not be deemed present findings or conclusions, and as such shall await further adjudication of the remaining issues of alleged and denied conversion on the part of City and resulting damage, if any, to Pepin.